STANLEY A. TWITCHELL v. MINNEAPOLIS, ST. PAUL & SAULT STE. MARIE RAILWAY COMPANY.[1]

March 26, 1909.

Nos. 15,862—(143).

**Railroad Frog—Defendant's Duty to Tricycle Rider.**
Plaintiff applied to defendant for a motor velocipede. Defendant furnished a tricycle, propelled by hand and provided with a brake. Plaintiff attached a gasolene engine, in the use and construction of which he was an expert. With defendant's consent and approval he used this motor tricycle. While plaintiff was driving it in the course of his employment, it was derailed at a frog, and plaintiff injured. The claim as to defendant's negligence was that the point of the frog was out of alignment with the rail. There was proof of some lack of alignment. The frog was of the rigid or clamp type, and in the identical condition in which it was at the time of the accident had been used for two years daily by freight and passenger coaches and by locomotive engines, and at times by handcars, without accident or trouble. The guard rail was properly placed. It is *held* that defendant's primary duty as to the frog was to furnish and maintain it so as to safely carry freight and passengers in the performance of its duty as a common carrier; that defendant's duty to plaintiff did not require it to provide a frog so mechanically perfect and in so precise alignment with its track that plaintiff could safe-

1 Reported in 120 N. W. 531.

ly run his light machine, with its wheels of small diameter, thin flanges, and narrow tread, at such a rate of speed that the small guide wheel in front would climb the rail and the machine then run fifteen feet with such force that, when it encountered a tie or other obstacle, its front axle would be 'broken.

Action in the district court for Hennepin county to recover $7,500 damages for personal injuries. The case was tried before Dickinson, J., and a jury which rendered a verdict in favor of plaintiff for $2,100. From an order denying defendant's motion for judgment notwithstanding the verdict or for a new trial, it appealed. Reversed and judgment ordered for defendant notwithstanding the verdict.

*John L. Erdall* and *A. H. Bright,* for appellant.

*Larrabee & Davies,* for respondent.

JAGGARD, J.

Plaintiff and respondent, a gasolene expert, was employed by defendant and appellant as a pump repairer. His duties extended over one hundred twenty miles of defendant's track. He applied for a gasolene engine velocipede. He was furnished a tricycle propelled by hand and provided with a brake. He procured a gasolene engine himself and attached it. He used the motor tricycle thus constructed with the knowledge and approval of defendant. According to his own testimony, he was operating the car at a rate of six to eight miles per hour. The guide wheel struck the point of the frog, climbed the rail, the car was turned sideways, ran about fifteen feet, as plaintiff testified, "and struck a tie—I supposed it was a tie—struck some obstacle, and turned over and let the body of the car rest on my leg. The vibration of the car after striking shook my foot off the foot rest. The front axle broke, letting the car drop onto my leg. (The car had) slewed around, and let the front wheel go to one side of the track and the rear wheel was between the rails." Plaintiff sat about one-half the way between the forward and rear wheels on the right side. His left leg was broken. For injury thus inflicted, recovery was sought in this action.

In greater detail, the tricycle which plaintiff used was materially different in construction from the ordinary hand car and from the ordinary freight or passenger car. The frame was much slighter and far less rigid. To remedy this defect plaintiff took an iron brace and

fixed it to a wooden brace brought to the top of the sill. He put a brace from the guide wheel over to the sill, and then connected with the brace that extended on to the shaft over the frame to the guide wheel. The three wheels of the tricycle were narrower as to tread, thinner as to flanges, and smaller as to diameter than ordinary car wheels. The guide wheel was smaller than the two parallel wheels of the velocipede. The weight of the tricycle itself was one hundred fifty pounds, and with the engine three hundred twenty five pounds.

The record contains some confusion as to the points of the compass involved. According to a photograph, used by one of the parties without criticism, the directions were as follows: The switch in question was placed where the side track left the main track to the west, so that the heel or toe of the frog was to the south, and the point of the frog faced north. The wing of the westerly rail of the main track angled towards the west, and ended at a point between the rails of the spur track, and will be referred to as the "outer wing." The wing of the easterly rail of the spur track angled towards the east, between the rails of the main track, and will be referred to as the "inner wing." The throat or mouth of the frog was to the north of the point. The guard rail of the main line was to the east, opposite the frog. The guard rail of the side track was to the west, and opposite the frog. The frog itself was of the type known as a "clamp," or "rigid" frog. It was about eight feet in length. The distance between the point of this particular frog and the outer wing rail was two or two and a fourth inches. The distance between the point of the frog and the inner wing rail was two or two and a half inches. The distance between the point of the frog and its throat or mouth—that is, where the wing rails angled from the main and side tracks, respectively—was about three inches. The distance between each guard rail and the track rail, respectively, was the standard, namely, two inches.

Plaintiff's claim as to negligence on the part of the defendant was that the point of the frog at which the accident happened was five-eighths of an inch out of alignment with the westerly rail of the main track. He was going south. The contention is that the guide wheel, by virtue of this lack of alignment, instead of running smoothly over the point of the frog, struck it, and was caused to climb the rail. In support of this allegation, plaintiff introduced some direct testimony

that on visual inspection the lack of alignment appeared. In large part, however, his evidence on this point consisted of an experiment made by starting a string from a point south of the frog, running it in a northerly direction along the easterly ball of the west rail, past and in contact with the point, and thence to a point on the easterly ball of the same rail beyond the frog. The exact place at which the string came in contact with the main rail north of the point was not fixed. The photographs in evidence show that this was a considerable distance beyond the northerly end of the rail which was a part of the clamp switch. It appears, also, to have been about opposite the northerly end of the guide rails. One end of the string was fastened about three and a half feet from the point of the frog, south of the point. Whether the main track at the end beyond this point ran on a straight line or on a curve did not affirmatively appear. At the throat or mouth of the frog, and for some distance beyond and to the north, the photographs show that the string did not come in contact with the westerly rail of the track. The oral testimony was that this distance was five-eighths of an inch. There was also testimony that the rail at this point was "kind of rusty."

Plaintiff's theory was that "the frog originally was built for a different angle, that is, the rails were supposed to cross at more of an angle than they do cross. * * * In putting that frog in, they didn't have that rail run out broad enough angle, so they swung the whole frog, which is about eight feet long. It was swung out so as to line up with the siding rail, and they tried to split the difference, so it would line up. They tried to split the difference, so it would line up, and that point was out of line. And on the siding the cars had been shoved on the siding so that it wore the point down like a knife edge; so it stuck out just like a knife edge. * * * The edge of the main line did not seem to be worn as much. Q. And yet you say that projected in about five-eighths of an inch? A. The reason I would say for that is because of the cars going on the siding of the curve. It forced them on a curve. Q. Well, when the wheel passes over the main rail and strikes the point of the frog, the wheel must necessarily strike the point of the frog on the inside? * * * I found very little if any wear there."

On defendant's part there was direct evidence that the frog was regularly inspected and found to conform to standard requirements. After the accident a rigid road gauge was used to test the alignment, and showed that the track was essentially in perfect condition. Part of defendant's case was that the relative space of the rails after the frog was once put together could not be changed, because the parts were held rigid by the cast-iron blocks which appeared in the photographs. For at least two years the frog had been exactly in the same condition. During that time a mixed train, consisting of an engine and tank, some freight cars, and a passenger coach, ran over this frog going in one direction, and on its return going in the other direction, every day. Extra trains ran over it on an average every other day. More or less switching was done over it in connection with such trains. A hand car was run over it oftener than once every other day, and at times a hand velocipede was run over it. No accident, except the one in question, ever occurred at this frog, and no difficulty of any kind was ever experienced in connection with its use, either before or after the accident.

The jury returned a verdict for plaintiff in the sum of $2,100. This appeal was taken from the order of the trial court denying defendant's usual motion in the alternative.

The initial question is whether the plaintiff had borne the burden of showing actionable negligence on defendant's part. From the happening of the accident, no inference that such negligence existed is to be drawn. The question is whether the facts show a breach of duty by defendant to the plaintiff. The primary purpose of defendant's track was to haul and switch ordinary cars. That the frog and track was sufficient for the purpose, and that defendant exercised due care with reference to this use, is conclusively shown by undisputed testimony. Assuming that plaintiff has shown imperfect alignment between the point of the frog and the westerly rail of the main track at the throat, it appears as a matter of law that for ordinary use of the track this lack of alignment was a negligible quantity. The reason is apparent. Immediately opposite the frog in question was a guard rail, next to the easterly main track at the standard distance, or at such a distance as enabled it to correctly perform its proper function. In consequence, when an ordinary car approached the frog in either direction, the guard rail controlled its motion. The inside wheels would come in

contact with the easterly ball of the guard rail and be safely conducted on the main track until past the frog. When cars were sent over the side track exactly the corresponding thing happened. The significant circumstance is that the direction which the wheels would take was determined, not by the exact alignment of the point of the frog with the rails at its throat, but by the guard rail. It was absolutely necessary that at the frog there should be a considerable space between the point of the frog and its throat; otherwise, a crossing would be impossible. If this distance were great enough to allow the wheel to sag or drop down before it struck the frog, the danger would be obvious. No such distance is shown in this case, so far as it concerned the wheels of ordinary cars. The experience in the use of the frog demonstrates beyond question that the distance aforesaid was not excessive, and was adequate to permit the safe use of the side track.

The record may fairly be regarded as containing enough to have justified the jury in finding some lack of alignment between the point of the frog and the westerly rail of the main track north of that point; but, on consideration of both defendant's proof and plaintiff's own testimony and experiment, it could not be fairly found that such divergence was great. Defendant's testimony in large measure eliminated the personal factor of the witnesses, and is strongly persuasive of a proper alignment of the track, because it rested largely upon facts shown to exist in nature. Especial significance is to be attached to the employment of the rigid gauge, to the continued and safe use of the tracks, which remained unchanged after the regular inspection, and to the fact that the frog itself was rigid. How it was possible for that frog to have been "slewed around," as plaintiff contends, is not made clear. Plaintiff himself testified that he could discover no perceptible wear on the inside of the track. How a projection so great as plaintiff claims to have found is to be reconciled with this fact has not been shown to us. His verbal testimony involved the factors of individual error and conjecture. His experiments were in a measure inconclusive, because of the flexibility of the string used on the ball of the rail, and because of the absence of definiteness as to the place it came in contact with the rail north of the point and as to the line of the track at the northerly point of contact. We are not inclined, however, to place any considerable stress on these criticisms.

On the assumption that some lack of alignment was shown, and that

the accident happened at this point, it is quite clear that the difference between the structure of an ordinary car and of the velocipede was the necessary condition of the accident. The strong axle to which the wheels of an ordinary car are rigidly attached was shown to have been sufficient to have compelled the guard rail to perform its function. When, however, the smaller guide wheel, with its thin flange and narrow tread, reached the open space between the point. and the throat, or the point at which the lack of alignment occurred, the guard rail may not have functionated, or the motion of the velocipede may have been interfered with by the space about the point, or also by the lack of mechanically accurate alignment of the west rail of which plaintiff complains. "It may have dropped into the frog." Defendant owed the duty to exercise due care. That duty might, under conceivable circumstances, have involved the necessity of giving an employee who was operating a motor tricycle warning of the danger of passing over a frog somewhat out of alignment on a motor tricycle, unless he was going very slowly. No issue was raised by the pleadings or on the trial on this subject in this case. Moreover, this plaintiff would have known this by the exercise of ordinary observation. All reasonable question on the subject is eliminated by his own testimony "that he knew that the light car or velocipede he was running could easily be derailed when passing along the track, and especially when passing over a switch, unless he was most careful." Plaintiff knew, and sought to remedy the slight structure of the frame of the tricycle, and was familiar with the peculiarities of its construction and the general nature of the track over which it was run.

It is to be borne in mind that defendant's primary duty with respect to its track was to exercise commensurate care for the safety of transporting by means of locomotive engines and freight and passenger cars. Defendant was, of course, subject to the ordinary rule that the master must exercise due care in furnishing his servant a reasonably safe place in which to do his work. But it was not bound to anticipate that its employee would operate a vehicle intentionally made light in weight, slight in structure, and with smaller wheels at an excessive rate of speed; and it was not required to furnish and maintain its track in such condition as to make that rapid transit safe. By what means plaintiff could make the same track meet the necessities

of a tricycle and of an ordinary car or engine, both going at a rapid speed, has not been made to appear. If the alignment had been mathematically correct, there would be obvious and certain danger in sending even a hand car—a fortiori, a velocipede—over the track at a rapid rate of speed. In this case, if defendant had been going slowly enough, the accident would not have happened. The witnesses differed as to the rate of speed at which plaintiff was going. The estimates varied from the speed of a train to six or eight miles an hour. We undertake neither to reconcile these estimates nor to determine the credibility of the witnesses. Nor do we dogmatically assert that any speed over three miles an hour, as one of the witnesses insisted, would be too fast; nor that from eight to ten miles an hour was not slow enough. Under all the circumstances of the case, we are of opinion that the duty defendant owed plaintiff did not require it to maintain a frog so mathematically perfect or in so precise alignment with the rail that plaintiff could run his light machine, with its wheels of smaller diameter, thinner flanges, and narrower tread, at such a rate of speed that the smaller guide wheel in front could climb the rail and that the machine would then run fifteen feet with such force that, when it struck a tie or other obstacle, its axle would break. We conclude that actionable negligence on defendant's part was not shown.

It is perhaps immaterial whether the conclusion in this case be rested upon the absence of actionable negligence on defendant's part, or upon plaintiff's own contributory negligence or assumption of risk. The same conclusion may follow from any point of view. Judgment for defendant notwithstanding verdict is ordered.

Reversed.